UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

────────────────────────────────

SEAN STEPHEN KNORR,

                    Plaintiff,          **No. 6:15-cv-06702(MAT)**
                                        **DECISION AND ORDER**

          -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.

────────────────────────────────


## INTRODUCTION

Represented by counsel, Sean Stephen Knorr ("Plaintiff") brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## BACKGROUND

### I.   Procedural Status

Plaintiff applied for DIB on January 15, 2010, alleging disability beginning April 8, 2008, due to bulging discs in his back, headaches, and back and neck pain. Plaintiff's application was denied on January 13, 2011. A hearing was held on March 22, 2012, before administrative law judge Rosael Gautier, T.36-68,[1] who

---

[1]

Citations to "T." refer to pages from the certified transcript of the administrative record filed electronically by the Commissioner on March 1, 2016 (Dkt #6-1 through Dkt #6-13).

issued an unfavorable decision on April 12, 2012. T.10-22. The Appeals Council denied Plaintiff's request for review on April 11, 2013, T.1-3, and Plaintiff filed an appeal in this Court. <u>Knorr v. Comm'r of Soc. Sec.</u>, No. 6:13-cv-06291-MAT (W.D.N.Y. 2013). The Commissioner stipulated to a remand for further administrative proceedings.

A second administrative hearing was held on January 23, 2015, before Administrative Law Judge Connor J. O'Brien ("the ALJ"), who heard testimony from Plaintiff, medical expert Dr. Chukwuemeka Efobi,[2] and vocational expert Julie A. Andrews ("the VE"). The ALJ issued an unfavorable decision on September 18, 2015. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff timely commenced this action on November 18, 2015. The parties filed cross-motions for judgment on the pleadings. For the reasons discussed below, the Commissioner's decision is reversed, and the matter is reversed for the calculation and payment of benefits.

## II.  Summary of Relevant Medical Evidence

### A.   2008

Plaintiff was traveling in his capacity as a district manager for Circuit City when he was involved in a motor vehicle accident

---

[2]    Dr. Efobi provided opinion testimony solely concerning Plaintiff's mental impairments. Because Plaintiff does not challenge the mental aspect of the ALJ's residual functional capacity ("RFC") determination, Dr. Efobi's testimony need not be summarized herein.

("MVA") on April 8, 2008. In swerving to avoid an 18-wheeler truck going 70 m.p.h., Plaintiff's car was struck on the front driver's side and rolled over several times. Plaintiff was treated at the emergency room and discharged the same day.

On April 10, 2008, Plaintiff saw his primary care physician ("PCP") Prathima Jayaram, M.D., complaining of lower back pain and headaches. T.406. On examination, Plaintiff had left lumbosacral tenderness, muscle spasm, slightly decreased range of motion ("ROM"), and negative straight leg raising ("SLR"). He was diagnosed with acute lumbago and given Vicodin. A CT scan of his head was normal, and a lumbar spine MRI showed mild degenerative changes (facet arthropathy) and a transitional vertebral body at L4-S1; there were no fractures or dislocations. T.304-05. In July 2008, Plaintiff told his PCP that he continued to have moderate back pain that radiated from his lower back to his right thigh and that was aggravated by sitting, standing, and walking. T.415-16. Pain medication and physical therapy provided some relief. Examination showed bilateral tenderness from L4 to S1 and negative SLR. The PCP continued Plaintiff's pain medication, excused him from work for one more month, and restricted him to sitting, standing, and walking only 15 minutes at a time. On August 29, 2008, Plaintiff complained of radiation of lower back pain from the right leg to the ankle; he described the pain as an "ache, piercing," which occurred occasionally and was "worsening". T.424. Plaintiff reported that his symptoms were aggravated by sitting and

standing. He also had decreased mobility in his legs, along with spasms, tenderness, and tingling. Id.

Neurologist David Marzulo, D.O., examined Plaintiff in July 2008, in connection with his Workers' Compensation Board ("WCB") claim, T.249-53, and found that he had a lumber and cervical muscle strain for which maximum medical improvement should be reached by October 2008. Dr. Marzulo stated that Plaintiff was mildly and partially disabled at that time with subjective complaints, tenderness, no neurologic deficit, and cautious body maneuvering that could indicate a mild defect in mobility. Dr. Marzulo opined that Plaintiff could return to light duty work with a repetitive 5-pound weight restriction and limitation on driving to no more than 35 to 45 minutes per trip.

In August 2008, independent medical examiner ("IME") Richard DellaPorta, M.D., saw Plaintiff in connection with his WCB claim. T.254-56. Dr. DellaPorta noted that Plaintiff walked unaided with a normal gait and moved around the office independently and onto the examining table. On examination, Dr. DellaPorta noted tightness and tenderness in Plaintiff's cervical muscles, mildly to moderately decreased ROM in Plaintiff's neck and right shoulder, tenderness and decreased range of motion in Plaintiff's lumbar spine, and positive SLR. Dr. DellaPorta concluded that Plaintiff had a moderate to marked disability based on WCB guidelines and opined that Plaintiff should not perform work involving repetitive bending or twisting of his neck or back; lifting more than

20 pounds to chest level; heavy pushing or pulling; prolonged sitting, standing, or walking for longer than one to two hours without changing positions; or repetitive reaching over the shoulder with the right arm.

A lumbar spine MRI taken on September 23, 2008, showed a mild diffuse bulge at L4-5 without significant stenosis; the remainder of the spine was grossly unremarkable. T.298.

On December 2, 2008, Plaintiff began treating with Clifford Ameduri, M.D. in connection with his WCB claim. T.288-92. Dr. Ameduri observed reduced lumbar and cervical ROM, significant myofascial pain from L3 to L5, and positive SLR on the right. Plaintiff had a normal gait, muscle strength, and neurological examination findings. Dr. Ameduri concluded that Plaintiff's April 2008 MVA accident was the cause of his back pain and opined that, at that time, Plaintiff had a "marked disability" under the WCB guidelines, could not lift more than 9 pounds, and had not reached maximum medical improvement. T.292.

**B.    2009**

On January 22, 2009, Plaintiff returned to Dr. Ameduri, who observed a positive Minor's sign for back pain from sitting to standing, and a minimally antalgic gait. Lumbar flexion reduced. He had +4 myofascial trigger points in the deep paraspinal muscles at L4-5 and S1, and pain over the spinous process at L4-5. He had positive SLR on the right at 30 degrees (leg and back pain) and on the left at 45 degrees (back pain only). Dr. Ameduri assigned a

marked disability on a temporary basis. T.286. Plaintiff told Dr. Ameduri that he was looking for work, which Dr. Ameduri thought would help him. T.285. Dr. Ameduri prescribed trigger point injections, a muscle relaxant (metaxalone), and ordered an EMG of the lumbar spine and lower extremities. T.286. Plaintiff presented to Dr. Brenda Davis at Lifetime on March 19, 2009, to have forms completed. He had lower back pain with intermittent radiating "ach[ing], piercing" pain to his right thigh, aggravated by climbing stairs and lifting. He also had numbness, tenderness, and tingling in his legs. T.439. On examination, his back was positive for posterior and lumbar tenderness, and SLR was positive at 45 degrees on right.

On April 14, 2009, Plaintiff saw physician's assistant Maggie Reilly, P.A. with complaints of a constant headache in the frontal left and right of his skull, with pain radiating to the back of the skull and neck. T.442. The headaches began 3 months ago, generally occurred at night, and were associated with nausea, phonophobia, and photophobia.

Dr. DellaPorta performed an IME of Plaintiff on July 1, 2009, and completed a report. T.257-60. Plaintiff walked unaided with a normal gait and moved independently around the office and onto the examining table. On examination, there was no tenderness over the cervical spine, left paracervical muscles, left trapezius, or bilateral periscapular area, but there was tenderness at the right paracervical muscles and right trapezius. T.258-59. There was

tenderness at the mid-thoracic spine and lumbar spine but no tenderness over the coccyx. There was a marked decrease in extension, a mild-to-moderate decrease in right rotation, and a moderate-to-marked decrease in left rotation, with lower back pain on performing these motions. SLR was negative bilaterally to 80 degrees, with no change in the paresthesias in the thighs. Dr. DellaPorta opined that "[b]ased on the WCB guidelines and taking together the neck and back," Plaintiff has a "moderate partial disability" and "should not do work which involves repetitive bending or twisting of his neck or back;" and "should not lift more than 30 pounds . . . to chest level." In addition, there "should be no heavy pushing or pulling;" "no prolonged sitting or standing/walking and by that [he] mean[t] more than 2-3 hours without a chance to change positions;" and "no repetitive reaching over shoulder level with the right arm." T.259.

On July 28, 2009, Plaintiff presented to his PCP, Dr. Brenda Davis, for the purposes of having several forms completed prior to his matriculation at St. John Fisher College in September. He had "[n]o complaints" that day. T.447.

On referral from Dr. Ameduri, Plaintiff treated with pain anesthesiologist Roger Ng, M.D. at Rochester Brain & Spine on September 17, 2009. See T.207-10. He presented with complaints of lower back pain at a constant 6-7 out of 10, radiating into his hip and tailbone, and neck pain radiating into his right shoulder blade and down his right arm with numbness. T.207. Neither physical

therapy nor chiropractic manipulation nor a TENS unit had provided more than short-term relief. On examination, Dr. Ng noted limitations to cervical and lumbar ROM due to pain, but no strength deficits or neurologic abnormalities. Dr. Ng requested WCB authorization for occipital nerve blocks and facet injections and referred Plaintiff to the neurosurgery team for evaluation and prescribed a muscle relaxant (cyclobenzaprine). T.209—10.

On September 23, 2009, Plaintiff reported to neurosurgeon Dr. Seth Zeidman at Rochester Brain & Spine. His complaints and the doctor's clinical findings remained largely unchanged from the appointment with Dr. Ng. T.218-21. Dr. Zeidman requested WCB approval for follow-up MRIs of Plaintiff's lumbar and cervical regions. An MRI on October 1, 2009, confirmed the MRI findings obtained on September 23, 2008. The spine was in normal alignment, and the intervertebral discs were normal in height. There was no lateral spinal stenosis at T12-L1 through L3-4, but there was mild degenerative facet disease bilaterally at L3-4. There was mild bulging of the annulus fibrosus at L4—5, which was unchanged in appearance; there was mild degenerative facet disease at L4-5 but no stenosis. At L5-S1, there was degenerative facet disease but no stenosis. The MRI of the cervical spine was unremarkable. T.222-23.

On October 22, 2009, Plaintiff saw RPA-C Nathaniel Brochu. T.224-26. He continued to have lower back pain radiating into the anterior thighs, along the lateral calf, and into top of the foot, greater on the right than the left. The pain was exacerbated by

standing/sitting for periods of time and turning his back. He had neck pain on the right radiating up into the head, causing headaches. Clinical findings on examination remained largely unchanged. Authorization was requested for EMG and nerve conduction studies ("NCS") on both upper extremities to evaluate radicular symptoms; occipital nerve blocs; and transforaminal lumbar epidural steroid injections ("ESI") and facet injections.

Dr. Ng performed palliative injections on November 4, 2009, and December 2, 2009.  Plaintiff returned to Dr. Ng on January 15, 2010, who noted that the injections "seemed to help with the local [pain] but not much more than that and that the lumbar facets seemed to help for about 1—2 weeks." T.215. Plaintiff was having more pain into the lower extremities (anterior thighs, into his lateral calves and big toes). Dr. Ng noted positive SLR on the left but not on the right. Authorization was requested for lumbar ESIs and a new anticonvulsant (topiramate). T.216. Plaintiff underwent an EMG which was normal. T.268—69.

C.   **2010**

At a March 4, 2010 appointment with Dr. Ng, T.227-29, Plaintiff had continued complaints of neck and right arm pain, severe headaches, and radiating back pain, which was more bothersome than the neck pain. Bending and sudden movements exacerbated the back pain; turning his head exacerbated the neck pain. The neck injections did not help but the back injections provided "some temporary relief." T.227. The EMG and NCS revealed

-9-

no radiculopathy. WCB approval of ESIs at L4-5 was requested while Plaintiff awaited approval of the back fusion surgery recommended by Dr. Zeidman (a lumbar laminectomy at L4-S1 with transforaminal lumbar interbody fusion ("TLIF") at L4-L5). T.228—29.

Dr. Ameduri completed a Progress Report on March 23, 2010, stating that Plaintiff's disability under WCB guidelines was 75 percent. T.310-15. Dr. Ameduri stated that Plaintiff could return to work with limitations on bending, twisting and lifting, i.e., "no lifting more than 10 lb[s]" in a "sedentary job where he can change positions frequently." T.311, 314.

Dr. Ameduri completed a Progress Report on May 3, 2010, again stating that Plaintiff's disability under WCB guidelines was 75 percent, and that he could return to work in a "sedentary position only." T.318.

Plaintiff returned to Dr. Zeidman on April 13, 2010, T.230-32, with essentially no change in his cervical-to-right-arm pain, and an increase in lumbar to lower extremity pain due to winter weather and doing a bit more standing.

At his June 7, 2010 visit with Dr. Zeidman, T.232-35, Plaintiff's neck pain was "relatively unchanged" and he continued with back pain in the L4-L5 distribution, greater on the right than the left. Dr. Zeidman continued to advise, and request WCB approval for, a lumbar laminectomy, noting that Plaintiff had "failed numerous forms of conservative treatment." T.233-34. He remained temporarily totally disabled.

On July 2 and July 26, 2010, Plaintiff saw Dr. Ameduri, who noted continued pain, limitation in ROM, and positive SLR. T.280-81. Dr. Ameduri agreed that surgery was "a reasonable approach."

On July 20, 2010, Dr. Zeidman noted that Plaintiff had "failed numerous forms of conservative treatment" and requested WCB approval for the lumbar laminectomy. T.236-37.

On July 26, 2010, Plaintiff consulted with Dr. Christie McMorrow at Rochester Brain & Spine. T.239—43. She also agreed that Plaintiff should undergo surgery.  On May 3, 2010, neurosurgeon W. Jay Levy, M.D., performed an IME on Plaintiff. T.270-79. Subjectively, Plaintiff had "sharp" to "throbbing" low back and tailbone pain, down both legs to the right first toe and left upper thigh; numbness and tingling and pins-and-needles in both thighs, and throbbing pain that could change to a sharp pain in his neck to back of head; and occasional sharp pains running over his right foot. Dr. Levy noted that Plaintiff appeared comfortable, had a normal gait, and was able to get onto the examination table without assistance. T.275. With the pinwheel test, Plaintiff reported decreased sensation in his right medial foot. Motor testing was normal; Plaintiff demonstrated arm elevation to overhead level and otherwise had full strength. On examination, there was lumbar paraspinal tenderness at L4; lumbar ROM was "mildly" decreased; extension was 20 degrees less than normal; and lateral bending was 10 degrees less than normal. Cervical rotation was decreased by 20 degrees but flexion and extension were normal to 45 degrees.

Dr. Levy's findings with regard to the neurological and mechanical evaluation were normal. Because Plaintiff's condition had not improved with conservative therapy, Dr. Levy concurred that surgery was "reasonable and indicated." T.277. He opined that Plaintiff had a "marked partial temporary degree of causally related disability" with a "[c]autious" prognosis. T.277-78.

On August 5, 2010, Plaintiff saw Dr. Andrew Wensel for a second opinion about the proposed surgery. On examination, Plaintiff's gait was steady and nonantalgic. His lateral bending was somewhat restricted; flexion and extension of the back also were somewhat restricted, secondary to discomfort. T.266. Given that Plaintiff was neurologically intact, only had minimal lumbar disc degeneration at L4-L5, and had a non-focal neurological exam, Dr. Wensel was hesitant to go forward with any type of surgery; instead, he recommended that Plaintiff undergo a CT myelogram on his lumbar spine with additional imaging, including flexion/extension views, to determine whether Plaintiff was experiencing foraminal narrowing or listhesis. T.266—67. He also prescribed ibuprofen and cyclobenzaprine to address any inflammatory symptoms.

On August 10, 2010, Plaintiff followed up with Dr. Ameduri. T.244-45. On examination, Plaintiff had an antalgic gait, was tender to palpation over the lumbar spine, and had limited ROM in the lumbar spine. SLR was positive at 45 degrees; Minor's sign was positive from sitting to standing. Plaintiff newly complained of

fatigue and discomfort in right distal calf. When Plaintiff saw Dr. Ameduri again on September 17, 2010, his complaints and Dr. Ameduri's observations were essentially unchanged. T.246-47.

On November 29, 2010, Dr. Ameduri completed a form at the request of the NYS Office of Temporary and Disability Assistance. T.373-76. He indicated that Plaintiff could "occasionally" lift and carry up to 10 pounds, stand and/or walk less than 2 hours per 8-hour workday, and sit less than 6 hours per 8-hour workday. T.376. He stated that there were no other conditions significant to recovery. T.377. With regard to Plaintiff's ability to push and/or pull, Dr. Ameduri drew a line through "limited".

On December 2, 2010, Harbinder Toor, M.D. performed a consultative physical examination at the Commissioner's request. T.380-83. Dr. Toor noted that Plaintiff appeared to be in moderate pain, had a normal gait, could squat to 50 percent of full ROM, and had difficulty getting on and off the examination table due to cervical and thoracolumbar pain. He was able to rise from the chair without difficulty. On examination, Plaintiff had a reduced ROM in his lumbar and cervical spine, full ROM in all other joints, positive SLR bilaterally at 20 degrees (sitting and supine), normal reflexes in his upper and lower extremities, numbness in both legs, full strength in all upper and lower extremities, and intact hand and finger dexterity. T.381-82. Dr. Toor opined that Plaintiff's prognosis was "fair" and that he had "moderate" limitation in standing, walking, and sitting; "moderate to severe" limitation in

bending and lifting; and "mild to moderate" limitation in twisting, bending, and extending the cervical spine; and that his headaches "could interfere with his routine." T.382.

On January 6, 2011, Plaintiff underwent the CT myelogram recommended by Dr. Wensel, T.560-61, which revealed a transitional segment at L5, and a small ventral impression without central canal stenosis, as well as mild to moderate foraminal narrowing, at L4-L5. There was a developmental abnormality at L4-L5 left facet, but "nothing . . . hard and fast that would describe why he is having symptoms." T.560. Dr. Wensel recommended continuation of some other nonoperative management options, including chiropractic manipulation of the lower back with Dr. Steven Foley. Id.

Dr. Ameduri completed a Progress Report on January 10, 2011, stating that Plaintiff's disability under the WCB guidelines was 75 percent, and that he could return to work in a "sedentary position only." T.591. The form does not define "sedentary," Dr. Ameduri did not indicate particular limitations on work-related activities.

On February 22, 2011, Plaintiff was involved in a second MVA in which his vehicle was rear-ended while he was stopped at a red light by another vehicle traveling at 70 m.p.h. Plaintiff's car was "totaled." T.573.

On March 24, 2011, Plaintiff saw Dr. Zeidman with complaints of worsening back and neck pain following the recent MVA. On examination, Plaintiff's ROM in his neck and spine were physiologic

but with discomfort on bending. T.574. The examination revealed no other abnormalities. Id. A lumbar spine MRI performed on March 26, 2011, showed no significant changes. An "extremely minimal disc bulge minimally flatten[ed] the ventral thecal sac and minimally narrow[ed] the central canal" at L4-5. T.576. Disc/osteophyte complex and facet hypertrophic change resulted in mild bilateral neural foraminal narrowing. Id. MRIs on April 1, 2011, of the cervical and thoracic spines were unremarkable. T.578, 579.

On April 1, 2011, Plaintiff saw Dr. Ameduri and noted that since the February MVA, his "back perhaps hurts a little worse" and he also now had severe right knee pain. He has been receiving chiropractic treatments from Dr. Foley 3 to 4 times per week, but "it [was] not working." T.580. Dr. Ameduri prescribed Vicodin for pain.

Plaintiff returned to Dr. Zeidman on May 7, 2011, T.620-22, reporting daily pain in his posterior cervical spine that radiated through the base of his skull and behind his eyes and pain along the C3-C4-C5 distribution, greater on the right than the left. Plaintiff had continued low back pain, worse on the right than the left; pain in his right knee and behind his knee; and increased radicular pain on the right in an L4-L5 dermatomal distribution, particularly when ascending stairs or extending his knee. Dr. Zeidman said to continue with conservative treatment for the time being. Plaintiff was still attending chiropractic treatment 3 times per week and "note[d] pain relief from [these] treatments

albeit temporarily." T.620. On examination, Plaintiff walked with a normal gait and station. Strength in the upper and lower hamstrings was intact. He had discomfort in his neck and back upon bending. His spine was normal to palpation but there were muscle spasms present bilaterally. Dr. Zeidman requested a cranial CT scan to further evaluate Plaintiff's headaches. This was performed on May 12, 2011, and the results were normal. T.628.

On May 10, 2011, Dr. Ameduri completed a Progress Report, stating that Plaintiff's disability under the WCB guidelines was 100 percent, and that he could not return to work due to "severe pain." T.632.

### E.   2012

Plaintiff saw Dr. Zeidman on January 12, 2012, with continued aching pain across his back with radiation down his left greater than right leg; the pain followed a L4-L5 distribution on the left and an L3-L4 distribution on the right. T.947. Plaintiff ceased chiropractic treatment in November 2011, and had experienced increased pain since then. He wanted to revisit physical therapy and to see a therapist to talk about his post-MVA anxiety around driving. Id. Dr. Zeidman stated that Plaintiff remained temporarily totally disabled. T.948.

On June 4, 2012, Plaintiff saw Dr. Zeidman, noting increased pain levels, particularly in his posterior cervical spine, throughout his trapezius, and at times up into the base of his skull. The physical therapy focused on his cervical spine had

helped with the headaches, but he still had aching pain across his
back with radiation down both legs, more so on the left; the pain
followed an L4-L5 distribution on the left and an L3-L4
distribution on the right. T.953. Dr. Zeidman ordered a head CT
scan and a lumbar MRI, and stated that Plaintiff remained
temporarily totally disabled. T.954-55.

A cervical CT scan on June 29, 2012, showed "minimal
findings[,] unchanged from prior examination" on April 1, 2011.
T.942. A repeat MRI of the lumbar spine also taken on that date
showed "[v]ery modest findings with small disc bulge at L4-L5[,]
essentially unchanged when compared with the prior study from 2008.
Very minimal findings." T.944. An MRI of the brain on that date was
normal with no intracranial lesions. T.945.

A CT scan of the head on July 3, 2012, yielded normal
findings. T.965. An MRI of the cervical spine on July 3, 2012,
revealed "[m]inimal findings," unchanged from prior scan on
April 1, 2011. T.966. An MRI of the lumbar spine on July 3, 2012,
showed "[v]ery modest findings with small disc bulge at L4-L5[,]
essentially unchanged when compared with the prior study from 2008.
Very minimal findings." T.967.

Dr. Zeidman saw Plaintiff in follow up on August 2, 2012. His
complaints of headache pain were unchanged. As to the low back
pain, the radiating pain in his legs was now greater on the right
than on the left. T.968. Dr. Zeidman felt that based on the lumbar
MRI, Plaintiff "does have pathology" in his lumbar area "that could

account for his symptoms," and Dr. Zeidman requested authorization for transforaminal lumbar ESIs at L4-L5. T.971-72.

On September 11, 2012, Plaintiff was seen by neurologist Lawrence Samkoff, M.D., on referral from Dr. Zeidman, regarding his near-daily headaches of a generalized tight or throbbing nature, typically starting in the neck, then spreading into the posterior head, then radiating over the vertex into the frontal areas. T.1010. Dr. Samkoff's impression was "[c]hronic daily headache, with tension-type features, due to analgesic overuse/rebound." T.1015. Plaintiff was scheduled for a brain MRI to exclude intracranial hypotension, advised to stop ibuprofen, and told to begin amitriptyline for headache prophylaxis. Id.

At a health maintenance visit on October 30, 2012, with Dr. Davis, Plaintiff had full range of motion in his shoulders, elbows, hands, knees and legs bilaterally. There was no cervical spine tenderness, and he had normal mobility. In the lumbar spine, there was tenderness and mild pain with ROM. T.981.

**F.    2013**

On January 2, 2013, Plaintiff saw Dr. Samkoff, reporting headaches about 4 to 5 times per week with some nausea; he also had lightheadedness, photophobia, and phonophobia twice weekly. T.1018. The brain MRI was normal. Dr. Samkoff's impression was chronic mixed tension-migraine headaches, for which he increased the amitriptyline dosage and added Maxalt for the migraine features. T.1021.

On April 2, 2013, Plaintiff reported to Dr. Samkoff that he had 2 to 3 migraines per week; Maxalt provided some relief, but he still had a low-level, diffuse headache in the background. T.1023. Dr. Samkoff's impression was chronic mixed tension-migraine headaches, complicated by Plaintiff's poor sleep hygiene due to chronic low back pain. T.1026.

On June 20, 2013, Michael Rosenberg, M.D., performed a consultative physical examination of Plaintiff at the Commissioner's request. T.1037-41. Dr. Rosenberg noted that Plaintiff was in no acute distress, walked quite slowly secondary to his back pain, had a normal stance, used no assistive device, and could walk on his heels and toes without difficulty, but could not squat. T.1039. He changed clothes and got onto the examination table without assistance, but needed help getting off the table. He was able to rise from a chair without assistance, but was very slow in doing so. On examination, Plaintiff had full flexion in his cervical spine but reduced extension and rotation. T.1039. There was reduced lumbar ROM and pain with palpation in the cervical, lumbar and sacral regions. T.1039-40. SLR was positive bilaterally at 30 degrees, causing back pain. He had decreased strength (4/5) in his right upper extremity and lower extremity; reduced sensation in his right hand and right leg; full strength (5/5) in his left upper and lower extremities; full bilateral grip strength; and intact hand and finger dexterity. T.1040. For his medical source statement, Dr. Rosenberg opined that Plaintiff had "moderate"

restrictions for sitting, standing, walking, climbing stairs, and kneeling down. T.1040.

On July 9, 2013, Plaintiff saw Dr. Ng, T.1114, reporting that he had obtained about a week of relief following a cervical ESI, but the pain returned into both arms and hands. He had increased pain radiating into the back of his head to the top of his head, and had found it more difficult over the past 6 months getting out of bed. He had numbness and tingling into his hands. His pain level was 7-8/10, with a right-sided headache. Dr. Ng requested authorization for diagnostic facet injections and an EMG. Plaintiff remained 100 percent temporarily totally disabled. T.1116.

On July 15, 2013, Plaintiff saw Dr. Zeidman. T.1117. He reported that his lumbar symptoms had been worsening gradually over the past year. Chiropractic care had helped somewhat. Standing for long periods of time exacerbated his symptoms. He used to be able to ride a recumbent bike but could no longer tolerate that. Dr. Zeidman requested authorization for chiropractic treatment of Plaintiff's lumbar spine and a new lumbar MRI. Plaintiff remained temporarily 100 percent disabled. T.1119.

On July 18, 2013, Dr. Ameduri completed a report for the WCB claim, indicating that he would complete, under separate cover, a "C4.3 permanency strictly for the work related accident." T.1124. On August 22, 2013, and October 7, 2013, Dr. Ameduri saw Plaintiff in follow-up and indicated that Plaintiff's impairment was "11.1 C4, severity F %." T.1128. Plaintiff was to continue on the same

medications, continue chiropractic treatment, and follow up with Dr. Zeidman.

A July 2013 lumbar spine MRI showed a diffuse posterior bulge with minimal impression on the ventral aspect of the thecal sac, but no significant spinal canal stenosis. There was mild bilateral facet and ligamentaum flavum hypertrophy. The changes resulted in mild left foraminal stenosis, increased from June 29, 2012. T.1137; see also T.1134-35 (notes from Dr. Zeidman on 10/16/13 reviewing lumbar MRI). Dr. Zeidman indicated on October 16, 2013, that Plaintiff's temporary impairment was 100 percent. T.1136.

Plaintiff saw Dr. Ameduri at RB&S on November 18, 2013, with complaints of constant, stabbing, aching pain over the distal lumbar spine, with shooting pain radiating into the hips and lower extremities; and aching, throbbing pain over the cervical spine with radiation up the back of the neck with occasional headaches for which he had been taking propranolol, prescribed by neurologist Dr. Heidi Schwartz, with good results. T.1138. He had been treating with chiropractor Dr. Foley twice a week and obtaining some relief; however, further treatment was denied by his insurance. Dr. Ameduri noted that Plaintiff appeared to be in moderate-severe distress. His impairment continued to be "11.1, C4, severity F %." T.1141.

Plaintiff saw Dr. Zeidman on December 19, 2013, in follow up for his continued neck and back pain. He had pain into the shoulder and down both arms, a little worse on the right than the left, particularly along the C5-C7 distribution. He had pain across his

low back area radiating into the hips and buttocks and backs of legs, particularly along the L4-L5 distribution. T.1142. He had some difficulty holding onto objects, as well as some balance problems. Dr. Zeidman noted no signs of apparent distress. Plaintiff walked with a slight antalgic gait, and had some stability issues on heel-toe tandem walking. Dr. Zeidman requested authorization for a CT myelogram of the cervical and lumbar spine. T.1144.

Plaintiff saw Dr. Ameduri on December 30, 2013. His low back pain was a 6/10 and his neck pain was a 7-8/10. T.1146. He appeared to be in moderate-severe distress. He walked with a normal gait. T.1148. Dr. Ameduri noted that they were awaiting the results of the CT myelogram ordered by Dr. Zeidman before making decisions about further treatment interventions. He opined that Plaintiff was temporarily 100 percent disabled. T.1149.

### G.    2014

Plaintiff saw Dr. Ameduri at RB&S on March 5, 2014.  T.1150. He continued to have headaches and worsening neck pain with stabbing, aching pain over the cervical spine, with shooting pain into the shoulders; his low back pain was aching and shooting, with numbness and tingling into his lower extremities. He had resumed chiropractic care with Dr. Foley which he paid for out-of-pocket. The chiropractic care yielded "excellent results" and he had

decreased stiffness and pain, fewer headaches, and increased ROM. That day, his pain was a 7/10. T.1150. He remained 100 percent temporarily disabled. T.1153.

The cervical and lumbar myelograms on March 7, 2014, revealed "[f]airly modest findings" of "mild nerve root widening at C4-5 and C5-6 without nerve root cut off" and "medial nerve root deviation and some widening at L4-5 with a small ventral impression without central canal stenosis." T.1153-54.

On March 10, 2014, Plaintiff underwent CT scans of the cervical and lumbar spines with contrast post-myelography. T.1156-58. There were "[m]odest findings" at the cervical spine with a "widely patent central canal without significant foraminal compromise." The lumbar spine impression was a paracentral and right-sided protrusion at L4-5, and a congenitally malformed left facet at L4-5.

Plaintiff saw Dr. Zeidman on March 13, 2014, to review the recent imaging tests. T.1158-62. His subjective symptoms were unchanged from his visit on March 5, 2014. T.1158. Based on the test results, Dr. Zeidman recommended continued conservative treatment in the form of injections and referred Plaintiff to Dr. Ng. T.1160-61.

Plaintiff saw pain anesthesiologist Dr. Ng on April 3, 2014. T.1163-66. He had been receiving chiropractic adjustment which "help[ed] well" for him. He and was able to return to the gym about 3 times a week, working with some light weights and the elliptical

machine. T.1163. He had been experiencing more headaches and neck pain due to recent cold weather; the pain radiated into both shoulders and the arms posteriorly, and into the back of the head to the eyes bilaterally. His neck pain that day was 7/10. His back pain radiated on right anteriorly through the knee to the big toe, and on the left side to the knee and side of the leg. He had numbness and tingling into both legs. On exam, his gait was normal. He had tenderness of the greater occipital nerves, C6-7 paravertebral regions bilaterally, and trapezius regions; and limited ROM. SLR was positive bilaterally with low back pain on the left and low back and leg pain on the right. Dr. Ng sought authorization for occipital nerve blocks and lumbar facet injections. He remained temporarily 100 percent disabled.

Plaintiff saw Dr. Ameduri on April 16, 2014, in follow up. T.1167-70. He was having more frequent and more severe headaches which interrupted his sleep more than previously. He still was seeing Dr. Foley three times a week. Clinical observations were largely the same as at his previous appointment with Dr. Ng. Plaintiff remained temporarily 100 percent disabled.

On May 19, 2014, Plaintiff received occipital nerve blocks from Dr. Ng. T.1171-73.

Plaintiff saw Dr. Ameduri on May 30, 2014. He was seeing Dr. Foley for chiropractic care twice a week. He had been placed on propanolol as a headache preventative which had a positive effect; he was getting about three headaches a week at most. On

-24-

examination, he appeared to be in moderate-severe distress, mobility was unchanged, strength was full in lower extremities, and SLR was negative bilaterally. Plaintiff remained temporarily 100 percent disabled.

Plaintiff underwent a brain angiogram on July 7, 2014, which was normal. T.1178.

On July 22, 2014, Plaintiff saw Dr. Ameduri. T.1179-82. His back pain was slightly worse than last visit, and his headaches had been more intense over the past three weeks; stress from the sudden death of his younger sister had increased his pain. In particular, he was having more shooting pain in the right lower extremity than last month. He had been seeing Dr. Karen Vullo, a pain psychologist, twice a month and learning relaxation techniques and cognitive behavioral techniques for dealing with anxiety. His pain that day was 7/10 Clinical observations were largely the same as in May 2014. Plaintiff remained temporarily 100 percent disabled.

On August 6, 2014, Plaintiff saw Dr. Ng, reporting the essentially same symptoms as at his July 2014 appointment with Dr. Ameduri. T.1183-85. His pain that day was 6/10. The occipital nerve blocks Dr. Ng had performed in May only provided about 2 to 3 weeks' worth of relief. On exam, he was in no acute distress, mobility was unchanged, and SLR was positive bilaterally, with low back pain on left and low back and leg pain on right. Plaintiff remained temporarily 100 percent disabled.

Dr. Ng performed an interlaminar lumbar ESI to help with his back and radicular pain on August 22, 2014. T.1186-87.

On October 9, 2014, Plaintiff saw Dr. Ameduri in follow up. T.1188-91. Plaintiff reported headaches 3 to 4 times per week. One day he passed out during a migraine and had to be taken to the emergency room. The medication (propranolol) he was taking as a headache preventative was decreasing his blood pressure and might have contributed to this. He complained of stiffness and throbbing pain over the cervical spine with pain radiating into the right shoulder, up the back of his neck and over his head, radiating into the frontal region and behind his eyes. He had stabbing and throbbing pain over the distal lumbar region with shooting pain as well as numbness and tingling into the lower extremities. On examination, he appeared to be in moderate-severe distress, mobility was unchanged, and SLR was negative bilaterally. Plaintiff remained temporarily 100 percent disabled.

On October 27, 2014, Plaintiff saw Dr. Ng in follow up. T.1192-95. He reported that the LESI for his low back pain had provided a "significant result." His back "only recently" had been bothering him more. T.1192. The propanolol does help his headaches but he may be having slightly decreased blood pressure which is affecting his concentration. His neck pain was 6/10 that day; his back pain was of a similar intensity as at the last appointment with Dr. Ng, and a 7/10. Clinical findings were the same as at his previous appointment with Dr. Ng. He was down to a once-weekly

chiropractic visit. He continued psychotherapy with Dr. Vullo. Plaintiff remained temporarily 100 percent disabled. Dr. Ng prescribed a repeat LESI for his pain, which was performed on November 12, 2014, see T.1196-97.

On November 20, 2014, Plaintiff saw Dr. Ameduri. T.1198-1200. He had seen a new neurologist, Dr. Catherine Lavigne, who put him on new medications and continued the propranolol. He continued to have chronic headaches. He still was seeing chiropractor Dr. Foley and pain psychologist Dr. Vullo. His pain that day was 7/10. He walked with a normal gait. Neck ROM was physiologic; active ROM was reduced; passive ROM was full. Back ROM was reduced. SLR was negative bilaterally. Dr. Ameduri assigned impairment ratings to Plaintiff's back and neck as follows: 11.1.C4, Severity F % (back); 11.1.C4, Severity E % (neck).

**H.   2015**

Dr. Ameduri completed a Medical Source Statement on January 7, 2015. T.1052-56. He opined that Plaintiff could sit for 30 minutes at a time, and stand for 15 minutes at a time. He could stand/walk for less than 2 hours total in an 8-hour day, and sit for at least 6 hours total in an 8-hour day. He required a job that permitted shifting of positions at will. He could occasionally lift and carry up to 10 pounds; could occasionally climb ladders but never twist, stoop/bend, crouch/squat, or climb stairs; and could occasionally look down, turn his head to the right or left, and look up, but never hold head in a static position. T.1054. He could occasionally

-27-

grasp, turn, twist, perform fine manipulations, and reach with his arms (including overhead). T.1055. Dr. Ameduri stated that Plaintiff would need 15-minute breaks every 4 hours during a workday, and would be off-task more than 20 percent of the time. He would have good days and bad days, and would miss about 4 days per month of work. T.1055.

## III. The ALJ's Decision

The ALJ followed the five-step sequential evaluation, see 20 C.F.R. §§ 404.1520(a), 416.920(a), promulgated by the Commissioner for adjudicating disability claims. Of note, at step two, the ALJ found that through the date last insured ("DLI"), Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, cervicalgia, right hand positive Tinel's sign consistent with some nerve impairment, recurrent headaches, obesity, depression, generalized anxiety disorder, and panic disorder.

The ALJ then determined that Plaintiff had the RFC to perform a reduced range of sedentary work, as defined in 20 C.F.R. § 404.1567(a). In particular, Plaintiff

> requires a sit/stand option that allows him to change position every 60 minutes for up to 5 minutes without leaving the workstation. . . . He can occasionally stoop, crouch, twist at the waist, climb stairs, kneel, and crawl. He frequently can handle, finger and reach. He can frequently feel with his right dominant hand. He frequently can turn his head 45 degrees left or right, occasionally can raise or lower his head 45 degrees up or down, and cannot hold his head static/immobile for more than 5 minutes at a time. He can drive occasionally. . . . He can tolerate up to moderate noise . . . (business office, light traffic, grocery). He can perform simple,

repetitive tasks, and detailed tasks, but not complex
tasks. He can adapt to occasional changes in work
setting. He can work to meet daily goals, but not
maintain an hourly machine driven production rate. He
requires up to three short, less than five-minute breaks
in addition to the regularly scheduled breaks. He can
only occasionally make work related decisions and
judgments, and occasionally supervise others or set a
schedule.

T.661.

The ALJ noted that Plaintiff had past relevant work as a
retail chain store area supervisor (skilled and light exertional
level); sales attendant (unskilled and light exertional level);
data entry clerk (semiskilled and sedentary); telephone solicitor
(semi-skilled and sedentary exertional level); receptionist
(semi-skilled and sedentary exertional level); merchandise
deliverer (unskilled and medium exertional level); pharmacy
technician (semi-skilled and light exertional level); cashier
checker (semi-skilled and light exertional level). In light of the
foregoing RFC assessment, the ALJ determined, Plaintiff was unable
to perform any of his past relevant work. T.671.

At the time of his DLI, Plaintiff was 36 years-old, with a
bachelor's degree and some master's level coursework. The VE had
testified at the hearing that an individual with Plaintiff's age,
education, work experience, and RFC would be able to perform the
requirements of representative sedentary occupations that existed
in significant numbers in the national economy, including (1) brake
linings coater (DOT #574.685-010; SVP-2); (2) label pinker (DOT
#585.685-062; SVP-2); and (3) receptionist (DOT #237.367038;

SVP-4). <u>See</u> T.672. Accordingly, the ALJ found that Plaintiff was not under a disability through the DLI. T.673.

**DISCUSSION**

**I.    Plaintiff's First Contention: The RFC Was the Product of Legal Error and Unsupported by Substantial Evidence**

Plaintiff asserts, the ALJ failed to provide "good reasons" for discounting two medical source statements of Dr. Ameduri issued in November 2010, and January 2015. <u>See</u> Plaintiff's Brief ("Pl's Br.") (Dkt #9-1), Point ("Pt.") I(A), pp. 22-26. Plaintiff also contends that because the ALJ failed to "accord appreciable weight to any opinion in the record," the RFC was unsupported by substantial evidence. <u>Id.</u>, Pt. I(B), pp. 27-29.

Dr. Ameduri issued a number of WCB progress reports and other opinions about Plaintiff's disability status during their treating relationship. The focus of Plaintiff's argument is the medical source statements issued by Dr. Ameduri on November 29, 2010, and January 7, 2015. Plaintiff argues that the ALJ failed to provide "good reasons" for assigning them "little weight."

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician[.]" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (<u>per</u> <u>curiam</u>) (internal and other citations omitted). A corollary to the treating physician rule is the so-called "good reasons rule," which is based on the regulations specifying that "the Commissioner 'will always give good reasons'" for the weight given to a treating source opinion.

-30-

Halloran, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2);
citing 20 C.F.R. § 416.927(d)(2); citation omitted). "Those good
reasons must be 'supported by the evidence in the case record, and
must be sufficiently specific . . . .'" Blakely v. Commissioner of
Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting SSR 96-2p,
1996 WL 374188, at *5 (S.S.A. July 2, 1996)). The "good reasons"
rule exists to "ensur[e] that each denied claimant receives fair
process[.]" Rogers v. Commissioner of Social Sec., 486 F.3d 234,
243 (6th Cir. 2007). Accordingly, an ALJ's "'failure to follow the
procedural requirement of identifying the reasons for discounting
the opinions and for explaining precisely how those reasons
affected the weight' given 'denotes a lack of substantial evidence,
even where the conclusion of the ALJ may be justified based on the
record[,]'" Blakely, 581 F.3d at 407 (quotation omitted; emphasis
in original).

Here, the ALJ noted that the record contained "multiple
opinions" from Dr. Ameduri and referred specifically to reports
issued December 2, 2008; March 23, 2010; November 29, 2010;
April 1, 2011; and January 7, 2015. See T.669 (citations to record
omitted). The ALJ neither explicitly recognized that Dr. Ameduri
was a treating physician, nor even mentioned the treating physician
rule. Undoubtedly, Dr. Ameduri qualifies as a treating physician
given his lengthy and consistent therapeutic relationship with
Plaintiff, which commenced in 2008, shortly after the first MVA.
See, e.g., Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989)

("Whether the 'treating physician' rule is appropriately applied depends on 'the nature of the ongoing physician-treatment relationship.") (quotation omitted).

The ALJ assigned all of the opinions from Dr. Ameduri "little weight[.]" T.669. Where, as here, an ALJ elects not to accord controlling weight to a treating physician's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" id. (quoting 20 C.F.R. § 404.1527(d)(2)), such as "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)).

Plaintiff's treatment relationship with Dr. Ameduri spanned 8 years by the time of the second hearing. Dr. Ameduri saw Plaintiff frequently, and his treatment notes are consistently thorough and detailed. The ALJ did not consider that Dr. Ameduri was Board Certified in Physical Medicine & Rehabilitation, and that his treatment of Plaintiff focused solely on the neck and back impairments forming the basis of Plaintiff's present disability claim. Furthermore, as of May 22, 2013, T.1419, Dr. Ameduri had joined the staff at RB&S, a practice specializing in treating disorders and injuries of the cervical, thoracic and lumbar spine.

The frequency of Dr. Ameduri's examination of Plaintiff; the length, nature and extent of their treatment relationship; and Dr. Ameduri's practice focus on spinal conditions all weigh in favor of giving Dr. Ameduri's opinions significant, if not controlling weight.

However, according to the ALJ, Dr. Ameduri's "numerous opinions" were "inconsistent and poorly explained" since it was "not clear why Dr. Ameduri sometimes checked off that the claimant could do sedentary work but other times opined that he was totally disabled." T.669 (citing, e.g., T.318 (stating that Plaintiff could return to work in "sedentary positions only"). A number of the forms to which the ALJ refers were brief Progress Reports issued at the behest of the WCB, and the differences in the standards between the standards applicable to WC benefits and DIB could account for such differences. In the Workers' Compensation context, it was expected that Dr. Ameduri, and Plaintiff's other treating physicians, would give an opinion as to disability, expressed as a percentage. The Court recognizes that the ALJ is not required to accept as dispositive the opinion of Dr. Ameduri, or any other physician for that matter, that Plaintiff is "100 percent disabled" or "totally disabled." However, Dr. Ameduri's November 2010 and January 2015 medical source statements do not opine on the ultimate question of disability. Rather, as requested on the forms, Dr. Ameduri assessed Plaintiff's ability to perform various work-related functions and provide an opinion as to the exertional and

non-exertional limitations caused by Plaintiff's severe impairments and resultant symptoms. Furthermore, to the extent the ALJ rejected Dr. Ameduri's opinions as "poorly explained," the Court finds that this cannot constitute a "good reason" given that the ALJ made no attempt to seek clarification from Dr. Ameduri. It is well settled in this Circuit that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte."); Hartnett v. Apfel, 21 F. Supp.2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly") (citations omitted)).

After reviewing the record, the Court finds that they are consistent with his detailed treatment notes, and the detailed treatment notes of the specialists, Dr. Ng and Dr. Zeidman, with whom Plaintiff treated at RB&S, as well as the independent medical examiners and the neurologists who treat Plaintiff for his chronic headaches. For instance, the other functional assessments by examining physicians are consistent with the limitations assigned by Dr. Ameduri. First, there are the 2008 and 2009 IME reports by Dr. DellaPorta, who examined Plaintiff on multiple occasions in

connection with his WCB claim. The ALJ discounted these because they applied the Workers' Compensation guidelines and were "6 years old." T.668. The age of these opinions was due to the fact that Plaintiff prosecuted two appeals in district court, the first of which resulted in the Commissioner agreeing that remand was required. In any event, the two reports from Dr. DellaPorta were issued well within the relevant period, and several years prior to the DLI. To the extent the Dr. DellaPorta used Workers' Compensation parlance and standards to assess Plaintiff's degree of disability, the Court recognizes that the ALJ was free to disregard these portions of the reports. However, in both the 2008 and 2009 reports, Dr. DellaPorta provided function-by-function assessments of Plaintiff's physical limitations. Significantly, Dr. DellaPorta stated that Plaintiff cannot engage in "repetitive reaching over shoulder with the right arm." T.256. At the hearing, the VE testified that reducing the hypothetical individual's ability to reach, handle, and finger bilaterally from "frequently" to "occasionally" would preclude the ability to perform any work. T.748.

In addition to Dr. DellaPorta's reports, there are two consultative physician's reports, which the ALJ assigned only "little weight." See T.669, 670. Dr. Toor found a "moderate" limitation in standing, walking, and sitting; a "moderate to severe" limitation in bending and lifting; and a "mild to moderate" limitation in twisting, bending, and extending the cervical spine.

Dr. Rosenberg later found that Plaintiff had "moderate" restrictions in sitting, standing, walking, climbing stairs, and kneeling down. The ALJ assigned these assessments "little weight" because it was "not clear how the doctor defined" mild or moderate or severe limitations. T.669, 670. The ALJ then somewhat contrarily asserted that the RFC determination "provide[d] reasonable restrictions to address" the consultative physicians' opinions (which the ALJ had just said were assigned little weight and unclear). T.669, 670. However, Dr. Toor's and Dr. Rosenberg's opinions are not necessarily consistent with a sedentary RFC. "[C]ourts have found that even 'moderate' limitations raise questions as to a claimant's ability to perform prolonged sitting or standing[.]" Seignious v. Colvin, No. 6:15-CV-06065(MAT), 2016 WL 96219, at *3 (W.D.N.Y. Jan. 8, 2016) (medical source statement assessing "moderate to severe" limitations in sitting, standing, and walking was too vague to constitute substantial evidence for the ALJ's finding that claimant could perform sedentary work) (citing Malone v. Comm'r of Soc. Sec., No. 08-CV-1249 GLS/VEB, 2011 WL 817448, at *10 (N.D.N.Y. Jan. 18, 2011) ("At a minimum, an assessment of moderate limitation suggests a possibility that prolonged standing might pose a problem.")).

In addition to allegedly being inconsistent with the "overall record," the ALJ gave several other reasons for discounting Dr. Ameduri's medical source statements which likewise do not constitute "good reasons" and fail to address the required

regulatory factors. The next reason offered by the ALJ was that the "extreme limitations" "occasionally" assigned by Dr. Ameduri were "not consistent with the overall evidence of record." T.669. This single sentence of boilerplate referring to the "evidence of record" does not allow for meaningful appellate review and does not suffice as a "good reason." See, e.g., Laracuente v. Colvin, No. 15 CIV. 9583(AJP), ___ F. Supp.3d ___, 2016 WL 4004680, at *13 (S.D.N.Y. July 26, 2016) (The ALJ's "conclusory explanations that Dr. Lovings' May 23, 2014 and June 26, 2013 opinions were 'unsupported by objective clinical findings' and 'inconsistent with the medical evidence of record' do not account for the factors listed in 20 C.F.R. § 416.927(c).") (internal citations omitted). The only portion of the "overall evidence" that the ALJ mentioned was that Plaintiff had "been followed with relatively conservative treatment and ha[d] not undergone any surgical operations." However, this is not an accurate depiction of the course of Plaintiff's treatment. The record contains multiple references to a recommended lumbar laminectomy with TLIF at L4-L5 by Dr. Zeidman. treating physician Dr. Ameduri, and examining physicians Dr. McMorrow of RB&S and neurosurgeon Dr. Levy all concurred; only examining physician Dr. Wensel advised against surgery. Further, the ALJ omitted any mention of the fact that the conservative treatments Plaintiff has tried—physical therapy, a TENS unit, NSAIDs, opioid analgesics, muscle relaxants, anti-convulsant

medications, palliative injections, chiropractic adjustments—have only provided short-term, localized relief.

The ALJ also rejected Dr. Ameduri's opinions because the "extreme limitations that [were] occasionally assigned, including that the claimant could not even twist or bend, [were] not consistent with [Plaintiff]'s busy activities, which include take [sic] a full college course load, driving, raising a young child or [sic] coaching a basketball team." T.669. Again, this reason relies on a mischaracterization of the record. First, Plaintiff testified that when he pursued an associate's and bachelor's degree from St. John Fisher, he received special accommodations for testing pursuant to Section 504 of the Rehabilitation Act. T.708-09; see also T.331-40 (VESID case notes detailing accommodations due to neck and back pain, anxiety, a learning disability, limitations on bending/twisting, lifting, and sitting or standing for long periods of time). Under his Section 504 plan, Plaintiff's teachers accommodated his mental impairments by permitting him to leave class if his anxiety reached an uncomfortable level. T.735. When he began studying for his master's degree, he found it "very hard to concentrate, as well as sit" as a result of the symptoms caused by his mental and physical impairments. T.689-90. His grades suffered and he ultimately withdrew from the program. Second, Plaintiff's ability to drive a car, without more, does not preclude a finding of disability or establish that a person is otherwise capable of performing sedentary work. See, e.g., Archambault v. Astrue, No. 09

CIV. 6363 RJS MHD, 2010 WL 5829378, at *30 (S.D.N.Y. Dec. 13, 2010) ("Plaintiff's continued ability to operate a car and a boat do not preclude a finding of disability, as plaintiff only retains the capacity to perform sedentary work if he can sit for prolonged periods of time."), rep. and rec. adopted, No. 09 CIV. 6363 RJS MHD, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011). Plaintiff testified that he is limited from driving more than 30 minutes due to pain in his lower extremities. Despite the fact that driving itself causes him anxiety as a result of his involvement in two MVAs, he continues to drive himself places so that he can leave quickly if his anxiety symptoms flare up. See T.692-93, 734.

Next, the ALJ found that Plaintiff was "raising a young child," and that this was inconsistent with the limitations assigned by Dr. Ameduri. Plaintiff had a young daughter, but he was separated from his wife. He testified that he "ha[d] [his daughter] three nights a week, every other—", T.721, at which point the ALJ interjected, "So you have joint custody? Id. Not only does this reason misstate the record, it "fails to recognize differences between being a parent, caring for one's children at home, and performing substantial gainful employment in the competitive workplace on a 'regular and continuing basis,' i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule[.]'" Harris v. Colvin, 149 F. Supp. 3d 435, 444 (W.D.N.Y. 2016) (in finding that psychiatrist's opinion was inconsistent with claimant's role as caretaker of five children, ALJ mischaracterized the record,

ignoring fact that claimant received assistance in caring for her children from her husband and a friend, as well as from her oldest daughter, and nothing in either the Social Security Act or the relevant regulations and rulings suggested that individuals who engaged in child-rearing activities were disqualified from being found disabled) (quotation and citations omitted).

Finally, the ALJ stated that Plaintiff engaged in the activity of "coaching a basketball team," which also was inconsistent with the limitations assigned by Dr. Ameduri. Plaintiff testified, however, that he "help[ed] out sometimes at the School of the Arts" by "keep[ing] . . . . stats for some of their [basketball] games. . . ." T.720. The ALJ specifically questioned Plaintiff about "what's involved in keeping stats[,]"[3] and Plaintiff explained that he had an iPad and would take recordings of players taking shots. Id. The team had games generally twice a week. He said would attend both games "as long as [he is] feeling up to it." T.721. Plaintiff thus did not testify that he "coached" a basketball team.

Reasons, such as these, "which rel[y] on a mischaracterization of the record, cannot constitute a 'good reason' for rejecting a treating physician's opinion. St. Marthe v. Colvin, No. 6:15-cv-06436(MAT), 2016 WL 3514126, at *7 (W.D.N.Y. June 28, 2016)

---

[3]

For comparison, the Court reviewed the DOT's job description of athletic coach (#153.227-010). The strength factor rating of this job is "H", meaning Heavy Work. The DOT contemplates that a person who performs the job of "coach" would, inter alia, coach players individually or in groups, physically demonstrate the techniques of the sport coached, and oversee daily practice of players to instruct them in areas of deficiency. Plaintiff did not indicate that he performed any of these activities.

See, e.g., Malave v. Sullivan, 777 F. Supp. 247, 253 (S.D.N.Y. 1991) ("One stated reason for the ALJ's rejection of the treating physician's opinion is an apparent misreading of the record. . . . [T]o the extent that the ALJ's decision to reject the treating physician's determination of disability rested on this stated reason, that rejection is not supported by substantial evidence in the record.")).

In sum, the Court finds that the ALJ, in evaluating Dr. Ameduri's opinions, did not comply with the "good reasons" rule, did not consider the required regulatory factors, and relied on mischaracterizations of the record.

## II. Errors in the ALJ's Credibility Assessment

The ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." T.670. "The Court has found no support in the regulations or the caselaw from this Circuit supporting the propriety of basing a credibility determination solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding." Burton v. Colvin, No. 6:12-CV-6347 MAT, 2014 WL 2452952, at *11 (W.D.N.Y. June 2, 2014) (citations omitted). Because "[t]he assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms[,]" Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y.

Mar.19, 2013), it is not logical to decide a claimant's RFC prior to assessing his credibility. Id. "To use that RFC to discredit the claimant's subjective complaints merely compounds the error." Burton, 2014 WL 2452952, at *11 (citations omitted).

As discussed above in connection with the ALJ's weighing of Dr. Ameduri's opinions, the ALJ also misrepresented the record in connection with making findings about Plaintiff's credibility. While the ALJ "must. . .assess the credibility of th[e] [claimant's] testimony along with the remainder of the record," the ALJ "'cannot simply selectively choose evidence in the record that supports [the ALJ's] conclusions'. . . [or] mis-characterize a claimant's testimony." Meadors v. Astrue, 370 F. App'x 179, 185 n. 2 (2d Cir. 2010) (quotation omitted).

### III.  Remedy

The fourth sentence of 42 U.S.C. § 405(g) provides a reviewing court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court should order the payment of benefits when a remand for further proceedings is unnecessary because the record contains persuasive proof of disability. Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1981). Here, that standard is met. The ALJ's weighing of the medical source statements of Plaintiff's treating physician was erroneous, and the ALJ's assessment of Plaintiff's

credibility was based on various mischaracterizations of the record. If Dr. Ameduri's opinions were given controlling weight, and Plaintiff's testimony were credited, Plaintiff would be unable to maintain competitive gainful employment.

The Second Circuit "has recognized delay as a factor militating against a remand for further proceedings where the record contains substantial evidence of disability." McClain v. Barnhart, 299 F. Supp.2d 309, 310 (S.D.N.Y. 2004) (citations omitted). Reversal for calculation of benefits is particularly appropriate here because Plaintiff's disability claim has been pending for over six years, and additional administrative proceedings would only lead to further delay.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted. The Commissioner's decision is reversed, and the matter is remanded for the calculation and payment of benefits. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     September 13, 2016
           Rochester, New York

-43-